**PETERSBURG CELLULAR PARTNERSHIP, d/b/a 360° Communications Company, Plaintiff–Appellee,**

**United States of America, Intervenor,**

v.

**BOARD OF SUPERVISORS OF NOTTOWAY COUNTY, Defendant–Appellant.**

No. 99–1055.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1999

Decided March 7, 2000

**ARGUED:** Patrick Michael McSweeney, McSweeney, Burtch & Crump, P.C., Richmond, Virginia, for Appellant. Melvin Earl Gibson, Jr., Tremblay & Smith, L.L.P., Charlottesville, Virginia, for Appellee. Mark Bernard Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Intervenor. **ON BRIEF:** John L. Marshall, Jr., McSweeney, Burtch & Crump, P.C., Richmond, Virginia, for Appellant. Patricia D. McGraw, Tremblay & Smith, L.L.P., Charlottesville, Virginia, for Appellee. William B. Schultz, Acting Assistant Attorney General, Helen F. Fahey, United States Attorney, Alisa B. Klein, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Intervenor.

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

Reversed and remanded by published opinion. Judge NIEMEYER wrote an opinion, Parts I and II in which Judge KING concurred. Judge WILDENER wrote an opinion concurring in the judgement. Judge KING wrote a dissenting opinion.

## OPINION

PER CURIAM:

After Nottoway County, Virginia, denied 360° Communications Company a conditional use permit to erect a 199–foot wireless communications tower, the district court issued a writ of mandamus directing the County's Board of Supervisors to issue the permit. The district court reversed the County's decision after applying the "substantial evidence" standard imposed on the County's zoning procedures by § 704(a) of the Telecommunications Act of 1996.

On appeal, Nottoway County contends that its decision to deny the permit was indeed supported by "substantial evidence" within the meaning of the Telecommunications Act and that, in any event, the requirement that it apply a federal standard in making its zoning decisions violates the Tenth Amendment to the United States Constitution.

On the issue of whether Nottoway County's decision to deny the permit was supported by "substantial evidence," as required by § 704(a) of the Telecommunications Act, Judge Niemeyer and Judge King agree with the district court that the County's decision is not supported by substantial evidence for the reasons given in Part I and Part II of Judge Niemeyer's opinion, constituting the opinion for the court. Judge Widener dissents on this issue, concluding that the County's decision to deny the permit was supported by "substantial evidence."

Because, however, Judge Niemeyer concludes that the federally imposed standard authorizing a state or local legislative body to deny a permit only on substantial evidence violates the Tenth Amendment, he votes to reverse the judgment of the district court. Judge Widener concurs in this judgment, without reaching the constitutional issue, because he concludes that the district court erred in reversing the Board based on the evidence. Judge King dissents from this judgment, concluding that

§ 704(a) of the Telecommunications Act does not violate the Tenth Amendment.

In accordance with the foregoing, the judgment of the district court is reversed, and this case is remanded to the district court with instructions to vacate its writ of mandamus.

NIEMEYER, Circuit Judge:

While we agree with the district court, as discussed in Parts I and II, that Nottoway County's decision to deny the permit was not supported by "substantial evidence" as required by § 704(a) of the Telecommunications Act, I vote to reverse because the federally imposed standard authorizing a state or local legislative body to deny a permit only on substantial evidence violates the Tenth Amendment.

I

Petersburg Cellular Partnership, doing business as 360° Communications Company ("360° Communications"), submitted a zoning application for a "conditional use permit" to the zoning administrator of Nottoway County, Virginia, to erect a 199-foot wireless communications tower on a piece of commercially-zoned private property on U.S. Route 460, near its intersection with Virginia State Route 669. The erection of the tower would, under the County's law, require the issuance of a conditional use permit. The proposed tower would stand 75 feet from the nearest property line, 300 feet from the nearest residence, and 2 miles from a small airstrip.

The Nottoway County zoning administrator published notice in the local newspaper of public hearings on the application, to be held before the Nottoway County Planning Commission on April 14, 1998, and the Nottoway County Board of Supervisors on April 16, 1998. At the Planning Commission hearing, an unspecified number of citizens "questioned flight patterns" for airplanes using the nearby airstrip. Nonetheless, the Commission unanimously recommended approval of a use permit subject to three conditions: (1) approval by the Federal Aviation Administration ("FAA"), (2) free access by Nottoway County to the tower for emergency broadcasting, and (3) the absence of interference with television reception.

At the hearing before the Board of Supervisors two days later, three county residents expressed opposition to the proposed tower. Another resident telephoned a member of the Board to convey her opposition. Their comments generally concerned the tower's possible effect on airplanes using the nearby airstrip, the extent to which the tower might be an attractive nuisance to children, and the possibility that the tower might collapse. One resident, who lived on U.S. Route 460, stated:

[I]f there's a light on [the tower] it[can] confuse the pilots—if there isn't a light on it, then that pilot, when he comes in, he could hit the tower.... Another thing for the 460 people—it is an eyesore to have it there when we don't need it there.... If lightning or something was to strike it, how do we know part of it wouldn't hit 460? Some would hit this lad[y's] house right back here—she has small children. It wouldn't affect me that much but if an airplane was to hit the tower it would affect a lot of us so I'm opposed to it completely.

Another resident stated:

The tower from where their last stake is to my property line is 75 ft. It is less than 300 ft. to my house. I'm opposed to it.... [Pilots will] hit the tower whether it has a light on it or not. I don't want it that close to my property line.... I'm just opposed to it—it's too close to the houses. Even if the FAA does approve it with or without the lights, it's still a danger because you've got pilots out there—I'm not saying all pilots—but there are some pilots that will get cocky and want to show off and try to do stunts. What i[f] they try to do it near the tower? Wreck—it explodes—it's going to land on my house and my neighbor's house, and I don't

think y'all want that on your shoulders—the Board of Supervisors or 360° Communications.

\* \* \* \* \* \*

[D]on't put [the tower] so close to where there is a lot of residences and where there are children. Boys are going to be boys and when they get away from Mama and Daddy they are going to explore and do what they want to do. Sooner or later they'll try to climb the tower. I don't want it that close to my children. And also if they put a light on it how do you know that one of the pilots—not all of them but some of them have been known to be tired—mistake that light for the landing—if they are a new pilot to the area—and try to land the plane *going down* there. Instead of knowing it's a tower.

Representatives of 360° Communications responded to each of the concerns expressed at the hearing. They stated that the FAA would not approve the tower unless it was safe for planes, and if the FAA, or even if the Board, wanted a light on the tower, 360° Communications would provide one. They also pointed out that there would be an eight-foot security fence around the tower, which would keep curious children away from it, and that the tower would not be electrified. Finally, they explained that the tower was designed to withstand the highest wind on record for the area, even if covered with a half inch of ice, and that even if the tower were to collapse, it would collapse in on itself. Moreover, if it were to fall over, it would only hit dirt or trees, not buildings on adjacent property. Following the testimony, the Board of Supervisors voted to table 360° Communications' application pending FAA evaluation.

After the FAA issued approval of the proposed tower, the Board of Supervisors met on July 16, 1998, to decide whether to issue the requested permit. No one testified at this meeting. The Board voted unanimously to deny the permit. While the Board gave 360° Communications no explanation in a brief rejection letter, indi-

vidual board members briefly explained their votes at the July 16 meeting. One member stated that "the people in the neighborhood did not want ... the structure there." Another said, "I think this, this [is] close to people that live there and they do object to it. I think there is other land that could be obtained." And another said, "I've talked to my people in that area and they, they don't want it." One member questioned rhetorically, "are we going to allow our citizens to [take] this crap?"

Relying on § 704(a) of the Telecommunications Act of 1996, 360° Communications filed this action to reverse the Board of Supervisors' decision and to obtain "a mandatory injunction enforcing the terms of the Telecommunications Act by ordering the approval of the plaintiff's application." On cross-motions for summary judgment, the district court issued a writ of mandamus ordering that "defendant Board of Supervisors of Nottoway County approve plaintiff's March 20, 1998 application for a conditional use permit" and directing it to do so "at its next regularly scheduled meeting ... in no event ... later than thirty (30) days after entry of this writ." *Petersburg Cellular Partnership v. Board of Supervisors,* 29 F.Supp.2d 701, 707 (E.D.Va.1998). The district court explained that 360° Communications "dispelled" all of the "unsubstantiated" safety concerns, leaving the Board with only "general antagonism" expressed by three residents in person and one by telephone. *Id.* at 706. The court concluded, "were courts to sanction the denial of such permits based upon this substantively vague and numerically insubstantial opposition, the Telecommunications Act would be effectively nullified." *Id.* The "modest" and "speculative record" before the Board, the court held, was "insufficient as a matter of law." *Id.*

The Board of Supervisors filed this appeal, arguing that (1) Nottoway County's denial of the permit was in fact based on substantial evidence and (2) the statutory requirement, contained in § 704(a) of the

Telecommunications Act, that the County can only deny a permit based on substantial evidence violates the Tenth Amendment. The United States intervened to defend the constitutionality of the Act. *See* 28 U.S.C. § 2403(a).

## II

Congress enacted the Telecommunications Act of 1996 "to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104–104, 110 Stat. 56 (1996). Section 704(a) of the Act, which is aimed in part at making it easier for cellular telephone companies to obtain permits from state and local authorities to erect communications facilities, provides that state and local governments may not prevent construction of such a facility unless their decision is "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Section 704(a) also authorizes an applicant to seek enforcement of this provision in either state or federal court. 47 U.S.C. § 332(c)(7)(B)(v).

Nottoway County contends that the district court erred in concluding that its decision to deny the conditional use permit in this case was not supported by "substantial evidence contained in a written record." First, Nottoway County argues that the district court failed to appreciate the nature of evidence appropriately received and considered in a legislative, rather than adjudicative, context, pointing out that the zoning permit process does not engage in "reconstructing a past event," as is done in court. Rather, the process is a legislative one, involving predictions, value preferences, and policy judgments. Thus, the County contends that the district court should have accepted as substantial evidence not only the views of citizens in the community but also the value preferences of elected public officials when making legislative decisions, quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 52, 103 S.Ct.

2856, 77 L.Ed.2d 443 (1983) ("It is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion"). Alternatively, Nottoway County argues that even taking into account *only* the views of the local residents, its Board's decision was supported by substantial evidence. In support of this argument, the County cites our recent decision in *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach,* 155 F.3d 423 (4th Cir.1998), in which we relied on the repeated and widespread opposition of citizens to find that the Virginia Beach City Council's decision to deny permission for the construction of two towers was supported by substantial evidence.

■ Nottoway County's argument thus presents us with the initial question of whether the County Board's decision in this case was "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The term "substantial evidence" has a long-standing meaning in federal law. While it is more than a mere scintilla of evidence, it is less than a preponderance. *See Virginia Beach,* 155 F.3d at 430. It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). In *Virginia Beach,* we stated that when reviewing the decision of a local elected body, "a reasonable mind" means the mind of a reasonable legislator. *Id.* And in discussing how "reasonable" legislators act, we noted that "[i]t is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence." *Id.* Recognizing this principle, we upheld the decision of the Virginia Beach City Council to deny the permit application for two cellular towers that would have been placed on the premises of a church in a

heavily wooded, residential area. The City Council had based its rejection, in part, on the substantial opposition from local residents. Approximately 800 individuals had signed petitions opposing the towers because they feared the towers would damage the character of their residentially-zoned neighborhood which contained no significant commercial development, no commercial antenna towers, and no above-ground power lines. We held that this overwhelming opposition to towers, based on the likelihood that the towers would have substantially changed the character of the neighborhood, amounted to "substantial evidence" and was therefore a lawful basis for the City Council's decision to deny the permit. *Id.* at 431.

Following *Virginia Beach,* we held in *AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Board,* 172 F.3d 307 (4th Cir.1999), that the Winston–Salem Zoning Board had "substantial evidence" to deny a special use permit for the construction of a 148–foot antenna tower next to the James Hanes House, a historical site built in 1932 and surrounded by low-density, single-home, residential property with no commercial property nearby. The communications company itself described the proposed site was "an unspoiled serene tract of land in the midst of a bustling city." *Id.* at 310. Seeking to preserve the character of their neighborhood, approximately 150 local residents objected to the tower, either in person or by petition, noting that the proposed tower would have a negative impact on "the aesthetics of the neighborhood," "the desirability of the neighborhood," "residential property values," and "the historical and cultural value of the Hanes House." *Id.* at 311.

■ This case presents circumstances substantially and materially different from those in *Virginia Beach* and *Winston–Salem.* Instead of opposition from hundreds of residents seeking to maintain the character of the residential neighborhood in which they live, we have four individuals—three who testified in person and one who made a telephone call to a Board member—seeking to prevent construction of a tower in a commercially-zoned area based on speculative safety concerns. Moreover, the residents' objections in this case were readily addressed by objective features of the proposed tower. While one woman did state in passing that the tower would be an "eyesore," the principal reasons she and others gave for opposition were: (1) that pilots will be confused and either crash planes into or try to land planes on the tower, (2) that "boys [will] be boys" and climb the tower, and (3) that the tower will collapse onto people or homes.

■ In *Virginia Beach* and *Winston–Salem,* we held that the widespread expression of concerns about the change that a commercial communications tower would have on the residential character of a neighborhood amounted to substantial evidence. The concerns expressed were objectively reasonable because they were based on known experience about the effects that commercial uses can have on a residential neighborhood. If a legislative body denies a permit based on the *reasonably-founded* concerns of the community, then undoubtedly there is "substantial evidence" to support the body's decision. If, however, the concerns expressed by a community are objectively unreasonable, such as concerns based upon conjecture or speculation, then they lack probative value and will not amount to substantial evidence. The number of persons expressing concerns, standing alone, does not make evidence substantial, but it might be relevant to the reasonableness of the concern. In this case, the concerns expressed by a few citizens in Nottoway County can be readily classified as irrational and therefore insubstantial.

The first concern expressed in this case was that, regardless of whether the tower had a light on it, planes would crash into or attempt to land on the tower. While we agree that a plane hitting the tower would present a serious problem, we do not believe that there is any rational basis to conclude that such a crash would be likely.

While the initial proposal did not include a light on the tower and therefore might legitimately have tended to support this fear, 360° Communications subsequently agreed to put a light on the tower, and the FAA approved the tower with a light on it. In addition, the tower height of 199 feet and proximity of two miles to the airstrip are not a reasonable basis for fear of a plane crash. We cannot presume, in the absence of evidence otherwise, that the FAA would approve this tower if its proposed site posed a risk of it being hit by airplanes. In addition, it is a matter of common knowledge that numerous structures in the United States rise more than 200 feet, and rarely are any struck by airplanes. Indeed, the witnesses in this case referred to the existence of a 700–foot tower in the area without evidence of any airplane crashes.

In the same vein, one resident expressed concern that a pilot might "mistake the light [on the tower] for the landing [strip]—if they are a new pilot to the area—and try to land the plane going down there." Again, we cannot find a rational basis for this objection. The air traffic control system in the United States is sophisticated, and the licensing requirements for pilots are comprehensive, serving, among other purposes, to prevent pilot error of the type feared by this resident. Again, we emphasize that the FAA has approved the tower with the light on it. It surely would not have done so if the light was likely to present the illusion of a landing strip.

Making a second type of objection, a resident expressed the concern that "[b]oys are going to be boys and ... they are going to explore and do what they want to do[, including] climb[ing] the tower." While we cannot dispute the tautological observation that "boys are going to be boys," we do believe that the proposal in this case fully addresses the concern for children's safety. First, 360° Communications indicated that it would be placing an eight-foot security fence around the tower to keep children from climbing it. Second, 360° Communications pointed out that the tower would not be electrified. Third, because the proposed site is near the intersection of two highways, motorists passing by would undoubtedly deter the adventures of children who might attempt illegally to break into the tower site.

Finally, a resident expressed the concern that the tower could collapse onto homes or people. Again, we do not believe that this fear is rationally founded. First, the record contains no evidence indicating that there is any reasonable likelihood of the proposed tower collapsing since it was designed to withstand the highest winds ever recorded at the site, even when covered with a half inch of ice. Second, the tower was designed to collapse in on itself, thus presenting a danger to no one. Finally, even if the 199–foot tower were to fall outward, it physically could not reach the nearest house, which is 300 feet away. A possibility of the tower collapsing and hitting a person or a home in these circumstances is so extremely remote as to pose only a speculative concern.

In sum, we cannot accept any of the residents' concerns as reasonable. As the district court correctly stated: "[T]he record aptly illustrates that these perceived hazards were the result of unfounded conjecture and baseless speculation. The record provides irrefutable evidence that each of these concerns, though undoubtedly genuine, was dispelled by 360° Communications' representatives and the FAA." *Petersburg Cellular*, 29 F.Supp.2d at 706.

Because we conclude that a "reasonable legislator" would not base his decision upon the irrational concerns of a few constituents, we conclude that the Nottoway County Board of Supervisors' decision was not based upon substantial evidence contained in the record and thus that the County's denial of the requested permit was not consistent with federal law. *See* 47 U.S.C. § 332(c)(7)(B)(iii).

### III

Nottoway County contends that if enforcement of the federal standard im-

posed by § 704(a) of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii), requires the county to grant a zoning permit to 360° Communications, which it had otherwise determined not to do, then the federally imposed standard violates the Tenth Amendment because it coerces local governments to employ "intrusive federal rules" in their zoning and land use processes. The County argues that § 704(a) "crosses the line between encouragement and coercion of local governing bodies to apply federal requirements." Rejecting Nottoway County's constitutional argument made in the County's motion to amend the district court's ruling, the district court reasoned that the Telecommunications Act does not commandeer Nottoway County's legislative process because "the Act affords local governing bodies the choice of rendering decisions in accord with this relatively modest federal standard or having their actions preempted by federal regulation." Nottoway County maintains, however, that nothing in the language of the Act provides it a choice; it must employ the standards Congress mandated in deciding the siting of wireless communication facilities. This uninvited intrusion into traditional state and local zoning authority, it argues, leaves the state or locality "no choice at all," in violation of *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

360° Communications, urging a finding that the Act is constitutional, argues that Congress had the power, without violating the Tenth Amendment, to preempt state and local zoning decisions, but it chose not to on the condition that the state and local zoning boards comply with federal standards. It explains:

> In other words, while not preempting state and local zoning authorities entirely, Congress did preempt state and local zoning authorities to a limited extent, by enacting five specific limitations on local regulatory conduct, each of which is specifically denominated as such in the Act, and each of which constitutes an express preemption of state and local authority. As the district court noted, therefore,

the deal which has been struck is both clear and constitutional: Either the local governing bodies comply with these conditions, or complete preemption will follow.

The United States, intervening to defend the constitutionality of the Act, likewise argues that § 704(a) "simply preempts state law" and does not violate the principles set forth in *New York* and *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). It relies on other provisions of § 704(a) that are preemptive to argue that the provision imposing sitting standards on local boards is also preemptive. Alternatively, the United States argues that the Tenth Amendment does not prohibit the requirement that local officials apply a federal standard in making state zoning decisions because "state administrative decisionmakers who form part of a state's adjudicatory machinery are bound, like state judges, to apply federal law as well as state law in making their determinations," citing *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).

### A

The Telecommunications Act of 1996 seeks to promote a more efficient wireless communications system for consumers, and to this end, it facilitates the construction of communications facilities. Providers of cellular telephone service undoubtedly require a broad and far-reaching network of communications towers and other facilities. Even though local zoning boards do not directly regulate wireless communications service, their tower siting decisions have had a considerable impact on the development of wireless communications. Indeed, in enacting the Telecommunications Act, Congress found that "State and local requirements, siting and zoning decisions" had "created an inconsistent and, at times, conflicting patchwork of requirements" that was "inhibiting the deployment" of wireless communications services. H.R. Rep. No. 104–204, at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61. To address

this problem, the House version of the Telecommunications Act would have given authority to the Federal Communications Commission to regulate *directly* the siting of towers. The Senate version, on the other hand, would have allowed local governing bodies to continue exercising that responsibility. The Conference Committee decided against complete federal preemption and federal regulation and added § 704 of the Act as a compromise. In its report, the conference committee stated:

> The Conference agreement creates a new § 704 which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in limited circumstances set forth in the conference agreement.

H.R. Conf. Rep. No. 104–458, at 207–08 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 222.

Although § 704(a) of the Telecommunications Act, as finally enacted, provides that nothing in the Act "shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), this general preservation of local authority is limited by provisions requiring that a state or local government "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed," 47 U.S.C. § 332(c)(7)(B)(ii), and also requiring that any decision denying such a request "be in writing and supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii). The decision of any local authority is made reviewable in either a state or federal court which must hear and decide the case "on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). In addition to requiring state and local governments to apply these standards and procedures, the Act denies these local governments any authority to regulate the siting of communications towers based on "environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv).[1]

---

1. Section 704(a) provides in full:

(a) NATIONAL WIRELESS TELECOMMUNICATIONS SITING POLICY.—Section 332(c) (47 U.S.C. 332(c)) is amended by adding at the end the following new paragraph:

"(7) PRESERVATION OF LOCAL ZONING AUTHORITY.—"

"(A) GENERAL AUTHORITY.—Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."

"(B) LIMITATIONS.—"

"(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—"

"(I) shall not unreasonably discriminate among providers of functionally equivalent services; and"

"(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

"(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

"(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

"(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

"(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subpar-

## B

We must now determine whether Congress can constitutionally leave the zoning and permit authority for siting communications towers with states and local governments and, at the same time, forbid states and local governments from denying a permit to construct a personal wireless service facility except when that decision is rendered in writing and supported by "substantial evidence contained in a written record," as required by 47 U.S.C. § 332(c)(7)(B)(iii).

We begin our analysis by reviewing Nottoway County's contention that the federal standard contained in 47 U.S.C. § 332(c)(7)(B)(iii) alters the standard otherwise applied by zoning boards in Virginia for making zoning decisions. Our review of Virginia law appears to support this claim.

■ In Virginia, both the adoption of zoning regulations and the granting or denying of conditional use permits are legislative acts governed by the same principles and subject to the same standard of review. *See County Bd. of Arlington County v. Bratic,* 237 Va. 221, 377 S.E.2d 368, 372 (1989); *City Council of Virginia Beach v. Harrell,* 236 Va. 99, 372 S.E.2d 139, 141 (1988). Local boards have broad discretion in taking zoning actions in the exercise of their police powers. *See Harrell,* 372 S.E.2d at 141. As a consequence, a local government's denial of a conditional use permit need not be supported by any evidence but "is presumed to be valid and will not be disturbed by a court absent clear proof from the challenging party that the action is unreasonable, arbitrary, and bears no reasonable relation to the public health, safety, morals, or general welfare." *Id.* And any decision "supported by evidence sufficient to make the question 'fairly debatable' " must be sustained. *Id.* This standard would appear to be more deferential to local board action than the standard in the Telecommunications Act that limits the local board, allowing denial of a conditional use permit only when the board's decision is supported by substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(iii). Indeed, under Virginia law, when a zoning decision is challenged in court, the legislative body need not present *any* evidence to support its decision unless and until the challenger shows that (1) the denial was unreasonable and (2) his proposed use was reasonable. *See Harrell,* 372 S.E.2d at 141. And even then, if the legislative body shows the propriety of its action was fairly debatable, the decision is sustained. *See id.*

■ In addition to changing the circumstances under which a local board can deny a permit, the Telecommunications Act would also appear to alter the nature of permissible judicial intervention. In this case, the district court, acting by authority of the Telecommunications Act, actually ordered the local legislative body to issue the conditional use permit. *See Petersburg Cellular,* 29 F.Supp.2d at 707. If a Virginia state court, however, were to

agraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief."

"(C) DEFINITIONS.—For purposes of this paragraph—"

"(i) the term 'personal wireless services' means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;"

"(ii) the term 'personal wireless service facilities' means facilities for the provision of personal wireless services; and"

"(iii) the term 'unlicensed wireless service' means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v))."

Telecommunications Act of 1996, Pub.L. No. 104–104, § 704(a), 110 Stat. 56, 151–52 (1996).

find that a zoning decision could not be sustained, the court's only power under Virginia law would be to remand to the local body for reconsideration of the decision in its legislative discretion. Under Virginia law, the courts have "no power to rezone land to any classification or to order a legislative body to do so." *City of Richmond v. Randall*, 215 Va. 506, 211 S.E.2d 56, 61 (1975). Those decisions, under Virginia law, are considered "legislative prerogative[s]." *Id.*

Whether the federal standard in fact alters the state or local legislative process or outcomes, however, is not essential to the question of whether the imposition of the standard violates the Tenth Amendment. Imposition of any federal standard on a state or local body's legislative process, even if "relatively modest" as the district court characterized it, has at least two substantial, detrimental effects on federalism. First, the very act of imposition, without a meaningful opportunity for a state to opt out, compromises state and local sovereignty. And second, regardless of the relative effects of the federal and local standard, the imposition of a federal standard on a local board confuses the electorate as to which governmental unit, federal or local, is to be accountable for a legislative decision made by the local board. These two effects alone threaten fundamental constitutional values. They undermine the structure which assures the division of power and thereby preserves our fundamental liberties, and they compromise the effective exercise of democratic power, that power which is reserved to the people. We address these consequences in order.

■ The Tenth Amendment assures the system of dual sovereignty inherent in the constitutional structure, by reserving to the states or the people the powers not delegated by the Constitution to the United States. *See Printz v. United States*, 521 U.S. 898, 918–19, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). The federalist constitutional structure depends on this separation and independence of sovereigns, *see*

*Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1990), and rejects the theory that the states are auxiliary to the federal government's exercise of power. Indeed, the dual-sovereignty structure of the Constitution carefully preserves two, concurrent sovereigns over the people:

> [T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the state and federal governments would exercise concurrent authority over the people—who were, in Hamilton's words, "the only proper objects of government."

*Printz*, 521 U.S. at 919–20, 117 S.Ct. 2365 (quoting *The Federalist* No. 15); *see also Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2265, 144 L.Ed.2d 636 (1999) ("By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it" (internal quotation marks and citations omitted)). Accordingly, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

■ So important and fundamental are these requirements that they admit of no balancing of interests. *See Printz*, 521 U.S. at 932, 117 S.Ct. 2365. When a congressional enactment compromises "the structural framework of dual sovereignty," the compromise, regardless of its degree, results in a fundamental defect, and "no comparative assessment of the various interests can overcome [it]." *Id.* Consequently, the command that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program" is categorical. *Id.* at 933, 117 S.Ct. 2365 (quoting *New York*, 505 U.S. at 188, 112 S.Ct. 2408). The necessity that this rule be categorical is demonstrated by

the important values it preserves. As the Court in *Gregory* observed:

It assures a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; it makes government more responsive by putting the States in competition for a mobile citizenry.

*Gregory*, 501 U.S. at 458, 111 S.Ct. 2395 (citation omitted). Further, by assuring a division of power, the rule provides an overarching check on the abuse of governmental power thereby ensuring "the protection of our fundamental liberties." *Id.* (internal quotation marks and citations omitted).

Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.

*Id.*

Moreover, when the federal government commandeers state and local legislative processes to carry out its own goals, not only is the federal power aggrandized and the state power enslaved, but also the lines of separation are blurred, causing a loss of accountability to the people and confusion by them. When a local legislative body acts under a standard imposed by the federal government, even if the federal standard is comparable in effect to state standards, a significant risk arises that the citizens of the community will not know whether the legislative act is the product of Congress or of their local legislature. This confusion inevitably frustrates a normal democratic response. *See Steven G. Calabresi, Textualism and the Counter-majoritarian Difficulty,* 66 Geo. Wash. L.Rev. 1373, 1391 (1998) (arguing that "judicial enforcement of the jurisdictional lines of democratic government is potentially democracy enhancing [because] [m]a-jority rule or democracy presupposes that one knows and respects the relevant jurisdictional lines"). This concern formed an important basis for the Supreme Court's holding in *New York:*

[W]here the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished.... [W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.

*New York,* 505 U.S. at 168–69, 112 S.Ct. 2408 (citations omitted).

■ It is, of course, well understood that Congress may, through the exercise of enumerated powers, enact federal laws that state courts must apply. *See Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). And when a federal law conflicts with a state law, the Supremacy Clause of the Constitution requires that the federal law preempt the state law. *See* U.S. Const. Art. VI, cl. 2; *Gregory,* 501 U.S. at 460, 111 S.Ct. 2395; *Worm v. American Cyanamid Co.,* 970 F.2d 1301, 1304 (4th Cir.1992). Indeed, in the proper exercise of an enumerated federal power, Congress can preemptively legislate in an entire field, excluding any state activity therein. *See Worm,* 970 F.2d at 1304.

■ Moreover, if Congress desires that the states themselves become involved in a suggested federal regulatory scheme, it may employ incentives to encourage the states to do so. *See New York,* 505 U.S. at 171–73, 112 S.Ct. 2408. But it cannot coerce and unilaterally erase the lines of separation. *See Printz,* 521 U.S. at 932–33, 117 S.Ct. 2365.

Accordingly, whether the standards imposed on the state and local governments by the Telecommunications Act are relatively modest instructions cannot become part of the constitutional evaluation. The Tenth Amendment categorically bars the federal government from compelling state and local governments to administer a federal regulatory program. *See New York,* 505 U.S. at 188, 112 S.Ct. 2408; *see also Printz,* 521 U.S. at 932–33, 935, 117 S.Ct. 2365. Thus, the operative question in this case is whether the federal standards commandeer Nottoway County's legislative processes, leading to the dire outcomes described above, or whether they permissibly preempt or provide creative incentives.

360° Communications and the United States argue that the procedural requirements imposed by the Telecommunications Act amount to a simple "preemption of state law." Congress, they argue, has simply preempted any state law that would prevent construction of certain telecommunications equipment in the absence of "substantial evidence." This argument, however, ignores the fact that this "preemption" involves a prescription for state and local governing bodies to use their zoning and permitting power in a specified way. Perhaps any congressional instruction to the states can be characterized as preemption. For example, if Congress instructed state or local legislatures on the minimum qualifications of members voting on the siting of federally regulated facilities, or on the percentage of votes needed for approval or denial of such permits, or on the frequency with which the local body must meet to consider such requests, these instructions might be seen as a "preemption" of the legislature's operating rules. But it is also this type of "preemption" that would be unconstitutional because it would "commandeer the legislative process," by coopting potentially unwilling state and local legislative bodies to achieve federal policy goals. *New York,* 505 U.S. at 176, 112 S.Ct. 2408.

360° Communications and the United States also argue that § 704(a) of the Telecommunications Act provides state and lo-cal governments with a constitutional choice of either (1) deciding the siting of communications facilities in accordance with federal procedural requirements or (2) being preempted by federal law under the Commerce Clause. They maintain that this "choice," which Judge King's dissenting opinion "denominate[s] 'conditional preemption,'" *see infra* p. 712, amounts to a constitutionally appropriate inducement to states and local governments to follow federal policy, citing *New York,* 505 U.S. at 173–74, 112 S.Ct. 2408. But they fail to demonstrate where § 704(a) provides that "choice." To the contrary, § 704(a) unconditionally mandates (1) that a state or local government "act on any [facility siting] request … within a reasonable period of time," (2) that any decision denying a request "be in writing," and (3) that any decision denying a request be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(ii), (iii). No choice is provided, and no threat of preemption is expressed or implied.

Nottoway County observes that its only choice would be to abandon the business of land-use regulation and that this is no more a choice than that afforded the states in *New York.*

In *New York,* the state of New York was given the choice, under a portion of the Low–Level Radioactive Waste Policy Amendments Act of 1985, of either regulating low-level radioactive waste in a manner directed by Congress or "taking title to and possession of the low-level radioactive waste generated within [the state's] borders and becoming liable for all damages waste generators suffer as a result of the State['s] failure to do so promptly." 505 U.S. at 174–75, 112 S.Ct. 2408. The Supreme Court found this provision to be unconstitutional because each alternative would impose a duty on the states that Congress could not constitutionally impose. The Court stated that Congress "crossed the line distinguishing encouragement from coercion." *Id.* at 175, 112 S.Ct.

2408. Such coercion, the Court noted, diminishes the accountability of elected state officials, denying them the ability to "regulate in accordance with the views of the local electorate in matters not preempted." *Id.* at 169, 112 S.Ct. 2408. The same principles adhere in this case.

The "choice" suggested—that Nottoway County comply with § 704(a) of the Telecommunications Act or end its role as a land-use regulator—is no less coercive than the choice offered the states in *New York.* Indeed, it is not a choice at all. The Telecommunications Act does not suggest it, and it cannot be implied except in an ontological sense: one has a "choice" to avoid obeying a governmental command by ending his own existence. To suggest that a local governmental body withdraw from land-use regulation and leave the construction of structures in the community to the whims of the market is nothing short of suggesting that it end its existence in one of its most vital aspects.

As we have noted repeatedly, "land-use decisions are a *core function* of local government. Few other municipal functions have such an important and direct impact on the daily lives of those who live or work in a community." *Gardner v. City of Baltimore,* 969 F.2d 63, 67 (4th Cir.1992) (emphasis added); *see also Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 828 (4th Cir.1995). If a state, county, or town abandoned its local land-use power to regulate the siting of communications facilities, any number of telecommunications towers and other communications facilities could be erected in the midst of residential neighborhoods, next to schools, or in bucolic natural settings such as in the woods or on top of mountains—areas held in high value by most communities. Abandoning land use power in this way would put at risk the property value of every home in the jurisdiction and create the possibility that aesthetic quality of every area in the jurisdiction would be destroyed. The abandonment of land use control for towers is not a viable option for state and local governments. Similar to the option offered to states in *New York,* the reality

underlying this thin veil of "choice"—that Nottoway County must either submit to federal instruction or abdicate its zoning authority over the construction of communications towers, thus allowing them to be built anywhere without local participation, input, or approval—amounts in reality to coercion, not choice. The Constitution does not empower Congress to subject state and local lawmaking processes to this type of mandate. *See New York,* 505 U.S. at 162, 112 S.Ct. 2408.

■ Congress may govern directly the *people* of a state through laws enacted by Congress and authorized by the Constitution. But it may not govern the *states* for the purpose of indirectly exacting its will on the people. *See Alden,* 119 S.Ct. at 2247; *Printz,* 521 U.S. at 919–20, 117 S.Ct. 2365. Preemption involves the *direct* federal governance of the people in a way that supersedes concurrent state governance of the same people, not a federal usurpation of state government or a "commandeering" of state legislative or executive processes for federal ends. *See New York,* 505 U.S. at 162, 112 S.Ct. 2408 ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions" (citation omitted)). Requiring *direct* federal governance of the people also buttresses political accountability in our system of dual sovereignty. As we have noted above, the rigor of this structure does not preclude a non-coercive arrangement between federal and state sovereigns encouraged by federal incentives or achieved through voluntary cooperation. *See id.* at 166–69, 112 S.Ct. 2408. But it does preclude the presentation to a state of coercive "choices."

As the United States correctly observes, in the Telecommunications Act Congress did indeed preempt the states' rights to regulate in certain substantive areas, such as the right to determine the "environmen-

tal effects of radio frequency emissions." *See* 47 U.S.C. § 332(c)(7)(B)(iv). But that preemption does not save other provisions that "commandeer" state legislative processes when approving the location of towers. The deliberate choice that Congress made not to preempt, but to use, state legislative processes for siting towers precludes the federal government from instructing the states on how to use their processes for this purpose. As the Supreme Court has pointed out:

> States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government....
>
> Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the states to ... administer a federal regulatory program.

*New York*, 505 U.S. at 188, 112 S.Ct. 2408; *see also Printz*, 521 U.S. at 935, 117 S.Ct. 2365 (explaining that *New York*'s holding that Congress cannot compel the states to enforce a federal regulatory program extends to Congress' inability to conscript state officers directly "to administer or enforce a federal regulatory program").

■ The United States argues additionally that the Telecommunications Act is merely an announcement of federal law and that state courts and federal courts alike are required to apply that law. Although the United States' statement of the legal principle is a correct one, *see Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947), its application to the circumstances here is misplaced. In *Testa* the Court held that state *courts* cannot refuse to apply federal law because they are required to do so under the Supremacy Clause. *See id.* at 390–91, 393–94, 67 S.Ct. 810; U.S. Const. Art. VI, cl. 2. But the requirement that state courts apply federal law is materially different from the proposition that state zoning boards use federally mandated standards in their *legislative* processes. *See New York*, 505 U.S. at 192, 112 S.Ct. 2408. While the legislative decision of whether to grant a

land use permit might end up in the courts, the decision is "inescapably a political function ... [because] the very essence of elected zoning officials' responsibility [is] to mediate between developers, residents, commercial interests, and those who oppose and support growth and development in the community." *Sylvia Development*, 48 F.3d at 828. And there can be no doubt that in Virginia this function is legislative and not judicial. *See Bratic*, 377 S.E.2d at 372.

Finally, both 360° Communications and the United States argue that the Telecommunications Act is constitutional under the holding of *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). In *FERC*, the Supreme Court upheld the constitutionality of the Public Utility Regulatory Policies Act of 1978, finding that it contained only the "command" that state utility agencies "consider," but not necessarily adopt, federal standards as a precondition to continued state regulation of an otherwise preemptible field. *See* 456 U.S. at 764, 102 S.Ct. 2126. But in the Telecommunications Act, Congress mandated either application of federal standards or the abdication of all zoning authority over communications facilities. As the Court in *FERC* was careful to admonish, it "never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations." *Id.* at 761–62, 102 S.Ct. 2126. Thus, while the statute in *FERC* mandated "only *consideration* of federal standards," 456 U.S. at 764, 102 S.Ct. 2126, the Telecommunications Act effectively *requires* state and local governments who choose to exercise their core powers of regulating land use to apply a federally mandated standard and process. Moreover, the Supreme Court's holdings in *New York* and *Printz*, both decided after *FERC*, embrace this ground for distinguishing *FERC* from this case. *See Printz*, 521 U.S. at 928–29, 117 S.Ct. 2365; *New York*, 505 U.S. at 161–62, 112 S.Ct. 2408.

Because application of the "substantial evidence" standard imposed by § 704(a) of the Telecommunications Act would require us to overrule the will of Nottoway County exercised through its traditional legislative process, we must address the provision's constitutionality, and for the reasons given, I would hold that this provision of the Act, 47 U.S.C. § 332(c)(7)(B)(iii), "commandeer[s]" the County's legislative process and is therefore unconstitutional under the Tenth Amendment. *See New York*, 505 U.S. at 175, 112 S.Ct. 2408.

## IV

■ The conclusion that 47 U.S.C. § 332(c)(7)(B)(iii) is unconstitutional does not invalidate the rest of the Telecommunications Act. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (internal quotation marks and citations omitted). The substantial evidence standard imposed by 47 U.S.C. § 332(c)(7)(B)(iii) is part of § 704(a), which encourages the construction of wireless communications facilities, and the construction of such facilities is part of a large and complicated statutory scheme regulating telecommunications. Requiring communications companies to apply to local boards for siting communications towers and other facilities using local standards for approval will not interfere in a substantial way with the otherwise operative provisions of the Act, and the invalidation of a provision mandating a federal standard will not frustrate the purpose of these other provisions. As the Supreme Court observed in *New York:*

> Common sense suggests that where Congress has enacted a statutory scheme for an obvious purpose, and where Congress has included a series of provisions operating as incentives to achieve that purpose, the invalidation of one of the incentives should not ordinari-

ly cause Congress' overall intent to be frustrated.

*New York*, 505 U.S. at 186, 112 S.Ct. 2408.

## V

The purposes served by the Telecommunications Act of 1996 are important to the national interest in making telecommunications more available and efficient, and the power to regulate and promote interstate wireless communications falls well within Congress' commerce power. Surely, if Congress thought the matter should be the subject of federal law, it could enact a federal law preempting the field and directly regulating the siting of communications towers. We do not question this traditional method of federal regulation.

However, in the area of regulating the location of communications facilities, Congress was understandably reluctant to assert its preemption rights to deprive state and local governments of their important zoning and permit authority. It recognized that erecting telecommunications towers is of significant local interest and can be controversial due to both rational and irrational concerns of residents in the community. Moreover, preserving local legislative processes would make local officials accountable for land use decisions. Yet, Congress did not wish to cede control over the implementation of its policy of promoting the erection of communications facilities to localities that were often hostile to such facilities. Thus, through a compromise involving a partial preemption approach, it enacted § 704(a) of the Telecommunications Act, imposing federal standards on state and local legislative processes, thus leaving state and local legislative boards responsible and accountable for any fall-out in making siting decisions. Through this blend of assigned power, Congress apparently believed it could effect a federal policy promoting the erection of telecommunications towers, while preserving local interests in the process. But this particular blend erases the constitutional lines dividing power between the

federal and state sovereigns and therefore becomes a categorical violation of the Tenth Amendment.

Comparing 47 U.S.C. § 332(c)(7)(B)(iii) with the statutory provisions at issue in *New York* and *Printz,* one might argue that the former amounts to a minimal infringement on a state's legislative affairs and hence does not present grounds for judicial relief. Such an assertion, however, would reflect a profound misunderstanding of the role of the federal judiciary. *New York* and *Printz,* along with a host of other recent decisions, both from the Supreme Court and this circuit, emphasize that vigorous judicial umpiring of the constitutional structure serves to protect the liberty interests of the people. *See, e.g., Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Brzonkala v. Virginia Polytechnic Institute,* 169 F.3d 820 (4th Cir.1999) (en banc); *Brown v. North Carolina Div. of Motor Vehicles,* 166 F.3d 698 (4th Cir.1999). The federal judiciary cannot abdicate enforcing those guarantees strictly without rejecting the cornerstones upon which the protection of individual liberty rests—federalism, separation of powers, and limited government. *See The Federalist* No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961) (stating that "a double security arises to the rights of the people" as a result of the Constitution's "divid[ing power] between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments"). Even though we are reluctant to strike down as unconstitutional any provision of legislation, we cannot construe § 332(c)(7)(B)(iii) to be a constitutionally permissible *de minimis* infringement upon the fundamental constitutional order.

Accordingly, even though we have concluded that the decision of the Nottoway County Board of Supervisors in this case is not supported by "substantial evidence" as mandated by § 704(a) of the Telecommunications Act, I have also concluded that the imposition of that federal standard on the Board commandeers its legislative process, and therefore 47 U.S.C. § 332(c)(7)(B)(iii) is unconstitutional. We reverse and remand this case to the district court with instructions to vacate its writ of mandamus.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

WIDENER, Circuit Judge, concurring:

I concur in the result and in the per curiam opinion of the panel, but I do not concur in the opinion of either Judge Niemeyer or Judge King. For ease of reference I may call them the factual majority.

In my opinion, both the district court and the factual majority misconstrue the statute at issue in this appeal, 47 U.S.C. § 332(c)(7), and its purpose to preserve local zoning authority in the area of placement of personal wireless service facilities.

Plainly stated, the rule for review by the federal courts in such cases as this should be that the placement of personal wireless facilities is, in nearly all cases, a matter of State or local government land use laws except in the limited circumstances set forth in 47 U.S.C. § 332(c)(7). Those limited circumstances are: the local land use law shall not unreasonably discriminate among providers of functionally equivalent services and shall not prohibit or have the effect of prohibiting the provision of personal wireless services, (B)(i)(i–ii); the State or local government shall act on any request with respect to such facilities with-

in a reasonable period of time, (B)(ii); a decision of a State or local government with respect to placement shall be in writing and supported by substantial evidence contained in a written record, (B)(iii); and no State or local government may regulate the placement of such facilities on the basis of environmental effects of radio frequency emissions if such emissions comply with the Commission's regulations, (B)(iv).

The substantial evidence requirement element in the statute just as plainly means substantial evidence to support the decision of the State or local government authority under state law. So, if a local law requires or permits a personal wireless facility to be located at any given place and that place is in accordance with local land use law, the federal statute, § 332(c)(7), protects the decision of the local authority with respect to placement unless that decision is contrary to one of the limitations mentioned just above.

In my opinion, the legislative history and a proper construction of 47 U.S.C. § 332(c)(7) support the Board of Supervisors' decision to deny Petersburg Cellular's application for a conditional use permit. Additionally, I believe that the record contains substantial evidence to support the Board of Supervisors' decision under our precedent, as well as a correct construction of the statute, and that the district court and the majority erred in concluding otherwise. However, I concur in the judgment of the court that the district court's order be vacated but do not join in the opinion to reach the constitutional issue. *See Interstate Oil Pipe Line Co. v. Stone*, 337 U.S. 662, 668, 69 S.Ct. 1264, 93 L.Ed. 1613 (1949) (Burton, J., concurring).

Section 332(c)(7) of Title 47 is titled "[p]reservation of local zoning authority" and states in relevant part:

> Except as provided in this paragraph, *nothing*, in this Act [ ] shall *limit* or *affect* the authority of a State or local government or instrumentality thereof *over decisions regarding the placement,*

*construction, and modification* of personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A) (emphasis added). The legislative history of this section clearly supports State and local governments' authority over siting decisions for personal wireless towers, like the Board of Supervisors' July 16, 1998 decision to deny Petersburg Cellular's request. The legislative history provides that § 332(c)(7) was created to:

> prevent[ ] Commission preemption of local and State land use decisions and preserve[ ] the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth.

H.R. Conf. Rep. No. 104–458, at 207–08 (1996), *reprinted in* 1996 U.S.C.C.A.N. 142, 222.

Moreover, § 332(c)(7)'s legislative history contains other manifestations of Congress's intent that local and state land use and zoning decisions be tested under *local standards*. For example, the legislative history points out: (1) all Commission [Federal Communications Commission] rulemaking concerning the preemption of local zoning authority should be terminated; (2) the non discrimination clause provides localities with flexibility to treat facilities as permitted under "generally applicable zoning requirements"; and (3) the reasonable time requirement for action on a zoning request application is to be within "generally applicable time frames for zoning decision[s]." H.R. Conf. Rep. No. 104–458, at 208–209, *reprinted in* 1996 U.S.C.C.A.N. at 222–23. Nothing in § 332(c)(7) or in its legislative history gives a federal court power to substitute its judgment for that of the local zoning authorities. While Judicial review may be sought for those decisions that fail to comply with procedural and substantive limitations, however, courts are not free to substitute their own judgment for that of the board, even if they come to a different conclusion after looking at the evi-

dence. *AT & T Wireless PCS v. City Council of Virginia Beach,* 155 F.3d 423, 430 (4th Cir.1998). *Virginia Beach* also illuminates any difference between substantial evidence for a legislator and an administrative employee.

I am encouraged in my opinion by other circuits which have inquired into the legislative history. In *Aegerter v. City of Delafield,* 174 F.3d 886 (7th Cir.1999), the court explained:

> Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from *their zoning codes,* and we note that aesthetic harmony is a prominent goal underlying almost every code. By leaving most of the substantive authority to approve the location of personal wireless service facilities in the hands of state or local governments, Congress must have known that exactly the kind of decision the City of Delafield reached would occur from time to time.

174 F.3d at 891 (emphasis added).

In *City of Delafield,* the City exercised its authority to deny a request based on citizen opposition, despite that the new tower was to be " 'merely' another two feet," and would comply with all safety and engineering standards. 174 F.3d at 888. Air Page, one of the plaintiffs, requested a conditional use permit to enable it to replace an existing tower with a larger, more modernized tower. 174 F.3d at 888. After the City denied the request, Air Page, like Petersburg Cellular, sought to reverse the City's decision partially based on a lack of substantial evidence argument. 174 F.3d at 889. Air Page also argued that the denial had the effect of prohibiting wireless service in the area. This court held that the acts of the City had not prohibited wireless paging service in the area. The court also held that the decision of the City was supported under State law, and, as to the whole case, decided that "[s]ome may disagree with Congress's decision to leave so much authority in the hands of the state and local governments to affect the placement of [personal wireless service facilities]. But that is what it did when it passed the Telecommunications Act of 1996, and it is not [a federal court's] job to second-guess that political decision." 174 F.3d at 892.

In like vein, the First and Third Circuits have decided that the substantial evidence requirement in the federal statute is applied to the localities' own zoning requirements. In *Amherst, N.H. v. Omnipoint Communications Enterprises, Inc.,* 173 F.3d 9 (1st Cir.1999), the court reversed a district court which required the Town of Amherst to issue a permit to build towers such as those involved in this case because "[t]he individual variances in special exceptions sought did not meet specific requirements of State law or the March 1997 [Amherst] ordinance." 173 F.3d at 13. The court reasoned that substantial evidence under the federal statute at issue in this case "surely refers to the need for substantial evidence *under the criteria laid down by the zoning law itself.*" 173 F.3d at 14 (italics in original). The court concluded that "the substantial evidence test applies to the localities' own zoning requirements" 173 F.3d at 16, and applied that rule. The Third Circuit, in *Omnipoint Corp. v. Zoning Hearing Board,* applied local zoning law in affirming a district court which had required the issuance of a special exception by the Zoning Hearing Board of Pinegrove Township. 181 F.3d 403 (3d Cir.1999). It quoted and applied the rule in *Amherst* that "[t]he substantial evidence test applies to the localities' own zoning requirements." 181 F.3d at 408.

Thus, without exception, save in this circuit in the instant case, the rule in the Courts of Appeals for review in such cases is as I have stated it at the beginning of this opinion. A federal court is first to decide whether or not the local zoning law has been complied with. It should then decide whether substantial evidence supports that decision, and if the answer to both of those questions is yes, then the other prohibitions of the federal statute should be considered.

The property involved in this case is in a Conservation District, C–1, under the zoning ordinance of Nottaway County. Section 6.1 of that ordinance provides that such a district "is established to conserve ... open spaces [of a rural character] in order to facilitate: existing and future general farming operations; conservation of water and forest resources; and maintenance of a distinctly rural environment. Residential development should conform to the notion that it possesses lesser priority than the maintenance of the district's rural environment." Under § 6.2 there are ten permitted uses which do not include microwave relay antennas, but under § 6.3 are uses permitted by special exception. There are 14 of such uses which include No. 11, "microwave relay antennas," the structure at issue here.

Article 16 of the zoning ordinance is entitled "SPECIAL EXCEPTIONS." A special exception is defined as a use "that would not be appropriate generally or without restrictions throughout the zoning division or district but which, if controlled as to number, area location, or relation to the neighborhood, would promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity or general welfare."

It is this precise zoning ordinance which we are required to review under State law by the statutes involved and the decisions of three circuits. But without even mentioning the zoning ordinance and its special exception, the district court and factual majority in this court have decided under their own standards which have yet to be formulated or explained, have not been met. That alone is sufficient error to require a remand to the district court for appropriate action, as was the case in *City of Delafield*, supra. We have simply passed without mention the law of every other circuit that has considered the same.

Following our precedent in *Virginia Beach*, I would find that the Board of Supervisors' decision was supported by substantial evidence. Every citizen who voiced his or her opinion of Petersburg Cellular's proposed tower expressed opposition to it.[1] The record indicates practically unanimous community opposition to the tower. Two county residents and the Blackstone Town Manager testified before the Board of Supervisors and numerous residents registered their opposition to the tower in phone calls to individual board members.[2] These individuals collectively expressed opposition to the tower based on a variety of reasons including: it could be a dangerous obstacle to aircraft using the local airstrip; it posed a safety hazard to local children who would be tempted to play around the tower; it threatened bodily injury and damage to personal property if it ever collapsed; and it was an eyesore. Further, the record indicates that several pilots, who use the county airstrip, directly expressed their concerns regarding the placement and height of the tower to the Blackstone Town Manager and one board member. Although the record evidence in the instant case differs in form from the evidence in *Virginia Beach*, it does not differ in substance. The Nottoway County residents who expressed an opinion on the tower unanimously voiced their opposition to it. The Telecommunications Act does not require a local governing body to base its decision upon a particular form of evidence or dictate a requisite number of citizens who must oppose a permit before a board can deny it. Nottoway County is a rural county with a population of 15,000 citizens dispersed throughout a large area of 315 square miles. In contrast, the City of Virginia Beach has a population of more than 400,000 densely concentrated in a smaller area of 248 square miles. A particular town or county's geography and population will certainly affect the manner

---

1. The lessor, of course, agrees to the placement.

2. In fact, four out of the five members of the Board of Supervisors stated that they received phone calls from constituents opposing the tower.

in which residents participate in a zoning process and the number of residents who participate. The district court even noted, in a Freudian slip, its opinion of the County as "a backwater area" and questioned whether the citizens' opposition was "a fairly significant turn out given its rural population."

The district court wrongly considered the number of residents opposing the application and wrongly discounted the citizens' concerns as baseless, conjectural, and vague. A local legislator in a sparsely populated, rural county is justified in finding that the community opposition to a tower is more compelling than expert evidence indicating that the tower would be safely positioned. The inquiry is not whether the residents' stated reasons for opposing the tower are in and of themselves reasonable, but whether the community's opposition is compelling in the mind of the reasonable legislator. *See Virginia Beach,* 155 F.3d at 430. Local legislators are elected to represent their constituents and one would expect a representative to exercise his discretion and judgment to follow the expressed unanimous opinion of his constituents. "[W]e [should not] interpret the Act so as always to thwart average, nonexpert citizens; that is, to thwart democracy." *See Virginia Beach,* 155 F.3d at 431. While the residents' expressed and unexpressed reasons for opposing the tower are of significance, more significant is the unanimity of the opposition. Of equal significance is the refusal of Petersburg Cellular, and the willingness of the Board of Supervisors, to locate the tower elsewhere.

In conclusion, the decision made by the Board of Supervisors of Nottoway County was a written denial supported by substantial evidence in a written record. The district court's decision and the majority's review thereof are contrary to legislative intent because their conclusions result in a mandate to Nottoway County to place a personal wireless service tower in a place that it does not want one. It is not the court's place to dictate zoning decisions to a locality where residents and the Board of Supervisors have concluded that the tower belongs elsewhere. Furthermore, simply determining that a requested spot for a tower is not appropriate does not have the effect of prohibiting personal wireless service in the entire area. I must come to this conclusion given that § 332(c)(7)(A) preserves "the authority of a ... local government" over "decisions regarding the placement ... of wireless service facilities" with only limited exceptions, none of which have been violated.

Because I find that the district court's judgment should be reversed on the facts, I need not and do not reach the Constitutional question. Accordingly, I concur in the judgment of this court that the order of the district court requiring issuance of the permit be vacated.[3]

KING, Circuit Judge, dissenting:

The district court correctly concluded that the denial by the Nottoway County Board of Supervisors of 360° Communications' permit application was not supported by substantial evidence. In this respect, I agree fully with my colleague Judge Niemeyer that the denial of the special use permit to 360° Communications lacked substantial supporting evidence. Contrary to the view of Judge Niemeyer, however, I believe § 704(a)[1] of the Telecommunica-

---

**3.** It is well to note that the district court erred in issuing a writ of mandamus, even had relief been required. The federal mandamus statute, 28 U.S.C. § 1361, applies only to "an officer or employee of the United States or any agency thereof." It does not apply to state officials. *See AT & T Wireless PCS v. Winston–Salem Zoning Bd. of Adjustment,* 172 F.3d 307, 312 n. 3 (4th Cir.1999).

**1.** The Board contests the constitutionality of only one part of § 704(a), namely the following requirements found in § 704(a)(7)(B)(iii):

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

tions Act of 1996 (the "Act"), 47 U.S.C. § 332(c)(7)(B)(iii), to be constitutional. Accordingly, I would affirm the district court's rejection of the Board's constitutional challenge. Because the other panel members would, for their separate reasons, reverse the district court, I am compelled to dissent.[2]

### I.

The Board's argument that § 704(a) violates the fundamental principles of federalism embodied in the Tenth Amendment is indeed ironic. In the name of federalism, the Board would force Congress to deprive states of the substantial zoning authority that § 704(a) leaves in their hands, instead concentrating all zoning authority over the siting of telecommunications towers in the nation's capital. And to promote political accountability, the Board would have us strike down a statute passed by a popularly elected Congress regarding a subject squarely within the scope of the Commerce Clause.

In searching for precedential support, the Board inappropriately attempts to shoehorn § 704(a) under an inapplicable Supreme Court holding in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). However, § 704(a) can be forced into the analytical structure of *New York* only by reviving the repudiated rule of *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Finally, this view would necessarily require us to distinguish binding and adverse Supreme Court precedent on the basis of immaterial factual distinctions. *See ante* at 704 (discussing *FERC v. Mis-*

*sissippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982)).

### II.

Congress passed § 704(a) of the Act pursuant to its authority under the Commerce Clause, which authorizes Congress to "regulate Commerce with foreign Nations and among the several States...." U.S. Const. art. I, § 8, cl. 3. The subject matter of § 704(a) is squarely within the scope of the Commerce Clause itself; that is, the siting of telecommunications towers substantially affects interstate commerce, and thus is a proper subject for congressional regulation. *See United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ("Congress' commerce authority includes the power to regulate ... those activities that substantially affect interstate commerce.") (citations omitted).

The Act itself unquestionably focuses on issues central to the national economy: "[The] Act ... promotes competition and reduces regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." H.R. Rep. No. 104–204, at 47 (1996), *reprinted in* 1996 U.S.C.C.A.N. 10. More specifically, the provisions that eventually became § 704(a) were driven by Congress's desire to address the "inconsistent and, at times, conflicting patchwork of [state and local] requirements" that hindered the development of "[a] high quality national wireless communications network." *Id.* at 94–95, *reprinted in* 1996 U.S.C.C.A.N. at 61. There is no doubt that the field addressed by the Act in

---

The Board does not attack the other substantive requirements of § 704(a)(7)(B). However, for the sake of convenience and in order to avoid confusion, I adopt Judge Niemeyer's convention of referring to the disputed provision— § 704(a)(7)(B)(iii)—simply as § 704(a).

**2.** As noted, I agree with Judge Niemeyer's conclusion that the Board lacked substantial evidence to support its denial of the special

use permit. Accordingly, I do not further address the issue of the insubstantiality of the evidence before the Board. However, because of the import of Judge Niemeyer's conclusion that § 704(a) violates the Tenth Amendment, I am compelled to more extensively discuss the bases of my view that § 704(a) passes constitutional muster.

general, and § 704(a) in particular, is within the scope of the Commerce Clause.

Indeed, my friend Judge Niemeyer acknowledges that regulation of interstate wireless communications "falls well within Congress' commerce power." *Ante* at 705. But he assails § 704(a) on the ground that it allegedly contravenes the Tenth Amendment. Unless § 704(a) encroaches on the Tenth Amendment, it is a valid exercise of Congress's authority under the Commerce Clause.

Because I am convinced that Congress did not violate the Tenth Amendment when it enacted § 704(a), I would hold the statute constitutional and, except for the nature of the relief granted, affirm the judgment of the district court.[3]

### A.

The Commerce Clause grants Congress plenary power to regulate activities that substantially affect interstate commerce. *See FERC v. Mississippi*, 456 U.S. 742, 753, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Even so, when Congress, in exercising this broad power, does not regulate individuals directly, but seeks instead to induce the states themselves to regulate in a manner that Congress favors, Congress's power is limited by the Tenth Amendment. For example, the Tenth Amendment prohibits Congress from directly commanding states to pass or enforce laws: "The Federal Government may not compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Likewise, Congress may not issue such mandates to state executive officers without violating the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

Nevertheless, Congress may, consistent with the Tenth Amendment, enact legisla-tion that seeks to induce—without directly compelling—states to act according to federal policy. *See FERC*, 456 U.S. at 766, 102 S.Ct. 2126 (noting that "valid federal enactments may ... be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority"). For example, in exercising its spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). And of importance to this case, the Supreme Court has blessed Congress's conditional use of its preemptive powers under the Commerce Clause (a legislative technique that, for convenience's sake, I denominate "conditional preemption"). *See FERC*, 456 U.S. at 766, 102 S.Ct. 2126; *accord New York*, 505 U.S. at 173–74, 112 S.Ct. 2408; *Hodel v. Virginia Surface Mining & Reclam. Ass'n*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

Conditional preemption is made possible by the Constitution, specifically the combined effects of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Supremacy Clause, art. VI, cl. 2. The Supremacy Clause declares the "Laws of the United States" to be the "supreme Law of the Land, ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *Id.* The Commerce Clause, of course, empowers Congress to regulate interstate commerce. As a result of these constitutional underpinnings, when Congress enacts laws regulating interstate commerce, those laws preempt contrary state laws: "A wealth of precedent attests to Congressional authority to displace or preempt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law." *Hodel*, 452 U.S. at 290, 101 S.Ct. 2352.

---

3. The district court's grant of a writ of mandamus against the Board is inconsistent with our recent decision in *AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 312 n. 3 (4th Cir.1999).

As a result, I would vacate the writ of mandamus and remand this case for entry of an order for relief, consistent with *Winston–Salem*.

Congress need not directly preempt state law whenever it wishes to regulate private activity affecting interstate commerce. Instead, it may employ conditional preemption; that is, Congress may seek to induce states to regulate activities affecting interstate commerce by threatening to preempt contrary state regulation if the state itself fails to regulate in accordance with federal instruction. *E.g., id.* at 288–89, 101 S.Ct. 2352; *FERC,* 456 U.S. at 765, 102 S.Ct. 2126. The Supreme Court has repeatedly reaffirmed Congress's authority to enact such legislation:

> Where federal regulation of private activity is within the scope of the Commerce Clause, we have recognized the ability of Congress to offer States the choice of regulating that activity according to federal standards or having state law preempted by federal regulation.

*New York,* 505 U.S. 144, 173–74, 112 S.Ct. 2408, 120 L.Ed.2d 120; *see also, FERC,* 456 U.S. at 767 n. 30, 102 S.Ct. 2126 ("Congress may condition the validity of State enactments in a preemptible area on their conformity with federal law...."). 

The Supreme Court both reconfirmed and further delineated Congress's conditional preemption authority in *New York v. United States. See* 505 U.S. at 173–77, 112 S.Ct. 2408. In that case, the Court reviewed provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985 (LRWPAA), to which New York had raised a Tenth Amendment challenge.[4] It concluded that one of the challenged provisions of the LRWPAA was a valid example of conditional preemption, and therefore consistent with the Tenth Amendment. That provision presented a choice to states that produce low-level radioactive waste; those states could: (1) in accordance with federal standards, regulate the disposal of radioactive waste produced within their borders, either by building in state sites or by joining a compact with a state that has

such a site; or (2) be subject to federal regulations permitting states that do have storage sites ("sited" states) to exclude waste produced within unsited states. *Id.* at 174, 112 S.Ct. 2408.

In analyzing this regulatory plan, the Court first established that the second option—permitting sited states ultimately to deny access to waste from unsited states—would have been constitutional if enacted alone. *Id.* at 173, 112 S.Ct. 2408. The Court reasoned that because Congress may "authorize the States to discriminate against interstate commerce," it could have passed this provision independently. *Id.* (citing *Northeast Bancorp, Inc. v. Board of Governors,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985)).

Having determined that this option would be a valid, independent exercise of congressional power, the Court held that Congress had not violated the Tenth Amendment by conditioning the exercise of that power on whether a state established its own waste storage facility in accordance with federal regulations. *Id.* at 173–74, 105 S.Ct. 2545. This plan, the Court concluded, "represents a conditional exercise of Congress' commerce power, along the lines of those we have held to be within Congress' authority." *Id.* at 174, 105 S.Ct. 2545 (citing *Hodel,* 452 U.S. at 288, 101 S.Ct. 2352; *FERC,* 456 U.S. at 764–65, 102 S.Ct. 2126). Thus the *New York* Court reconfirmed that Congress may "condition the validity of State enactments in a preemptible area on their conformity with federal law." *FERC,* 456 U.S. at 767 n. 30, 102 S.Ct. 2126.

In addition to confirming the continued vitality of *FERC* and *Hodel,* the Court concluded that another provision of the LRWPAA fell outside the scope of those cases. In so doing, it held that one of the LRWPAA's incentive plans violated the

---

4. In addition to the two provisions discussed below, the *New York* Court reviewed a third set of provisions, which involved the imposition of surcharges on interstate shipments of low-level radioactive waste. *See* 505 U.S. at 171–73, 112 S.Ct. 2408. Although the Court did hold this third set of provisions constitutional, its analysis is not directly relevant here.

Tenth Amendment. This plan gave individual states the following options: (1) regulate low-level radioactive waste according to federal standards; or (2) take title to and possession of all such waste produced within the state's borders, agreeing thereby to become liable for any damage waste producers suffer because of the state's failure to act promptly. The Court determined that Congress lacked the power to enact either of these options as mandatory, independent legislation. *New York*, 505 U.S. at 176, 112 S.Ct. 2408. As a result, the Court held that Congress could not force states to choose between these two unconstitutional options:

> Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two.

*Id.*

The *New York* Court's treatment of the two LRWPAA provisions discussed above clarifies the scope of Congress's conditional preemption power. It demonstrates the difference between statutes that constitute proper, persuasive exercises of conditional preemption and those that "cross[ ] the line distinguishing encouragement from coercion." *Id.* at 175, 112 S.Ct. 2408. Congress may not force states to choose between two courses of action, neither of which Congress could constitutionally require the state to follow. *Id.* at 176, 112 S.Ct. 2408. Such a scheme necessarily encroaches on state sovereignty: "A choice between two unconstitutionally coercive regulatory techniques is no choice at all." *Id.* But where Congress acts in a field in which it could preempt state law entirely, Congress may still require states to choose between regulating in accordance with federal standards or being preempted by otherwise valid federal regulation. *Id.* at 174, 112 S.Ct. 2408; *Hodel*, 452 U.S. at 288–89, 101 S.Ct. 2352; *FERC*, 456 U.S. at 764–65, 102 S.Ct. 2126. Thus Congress

retains the power of conditional preemption, even though it cannot unconditionally command states to pass any particular regulation. *New York*, 505 U.S. at 188, 112 S.Ct. 2408.

### B.

When § 704(a) is examined under the analytical framework employed in *New York*, it does not in any way infringe the Tenth Amendment. Section 704(a) presents states with the following choice: (1) if the state denies an application to place, construct, or modify "personal wireless service facilities," it must do so upon a written record containing "substantial evidence" supporting the state's decision; or (2) the state must not regulate the placement, construction, or modification of such facilities at all. Judge Niemeyer acknowledges the substance of this choice. *See ante* at 705 ("[I]n the [Act], Congress mandated either application of federal standards or the abdication of all zoning authority over communications facilities."). To determine whether § 704(a) is a valid exercise of Congress's conditional preemption authority, we must decide whether Congress could constitutionally enact option (2) alone, thereby preempting all state zoning authority over wireless service facilities. If it could, then Congress also can condition its exercise of that authority on the state processing permit applications for wireless facilities in accordance with the standards of § 704(a). *See New York*, 505 U.S. at 173–74, 112 S.Ct. 2408.

In his separate opinion, Judge Niemeyer acknowledges that Congress may regulate interstate wireless communications under the Commerce Clause. *Ante* at 705. Further, he necessarily concedes that, in exercising this authority, Congress could bar states from regulating the siting of wireless towers: "[Congress] could enact a federal law *preempting the field* and directly regulating the siting of communications towers." *Ante* at 705 (emphasis added). Any federal law "preempting the field" would necessarily bar any state action re-

garding siting of wireless towers. U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States ... shall be the supreme Law of the Land."). The Supreme Court agrees that, where the subject to be regulated is private activity affecting interstate commerce, "[T]he Commerce Clause empowers Congress to prohibit all—and not just inconsistent—state regulation of such activities." *Hodel,* 452 U.S. at 290, 101 S.Ct. 2352.

The Supreme Court has confirmed that Congress may exercise this preemptive power in areas that states care deeply about and in ways states may consider unwise:

> Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result.

*Id.* For example, Congress may preempt state regulation in fields of such local importance as land-use planning. *E.g., id.* at 289, 101 S.Ct. 2352 (upholding constitutionality of Surface Mining Control and Reclamation Act of 1977 (SMCRA) despite argument that it "interferes with the States' ability to exercise their police powers by regulating land use"); *FERC,* 456 U.S. at 767 n. 30, 102 S.Ct. 2126 (noting that *Hodel* upheld SMCRA's land use regulations although "regulation of land use is perhaps the quintessential state activity").

Further, Congress may choose preemption even where it has not provided affirmative federal regulations to take the place of preempted state laws. *See FERC,* 456 U.S. at 766, 102 S.Ct. 2126. In *FERC,* the Supreme Court reviewed a provision of the Public Utilities Regulatory Policies Act of 1978 (PURPA), under which Congress gave states a choice between considering certain federal regulatory proposals or "abandoning regulation of the field altogether." *Id.* In upholding this section of PURPA against a Tenth Amendment challenge from the State of Mississippi, the Court noted that a state which chose to "abandon the field" would leave an area of great local importance unregulated:

> We recognize, of course, that the choice put to the States—that of either abandoning regulation of the field altogether or considering the federal standards—may be a difficult one. And that is particularly true when Congress, as is the case here, *has failed to provide an alternative regulatory mechanism to police the area in the event of state default.*

*Id.* (emphasis added). Nevertheless, the Court held that Congress could constitutionally require states to choose between taking affirmative, federally prescribed action or ceasing all regulation of the locally important—but preemptible—field of utilities regulation. *Id.* at 765, 102 S.Ct. 2126.

By acknowledging that Congress has authority to "preempt the field" of telecommunication tower siting, Judge Niemeyer concedes, *a fortiori,* that Congress may forbid states from regulating this subject. And Supreme Court precedent mandates this result. *See Hodel,* 452 U.S. at 290, 101 S.Ct. 2352. Because Congress could validly prohibit states from regulating the siting of telecommunications towers, it may constitutionally offer states a choice between (1) being subject to such a prohibition or (2) processing permit applications for communications towers in accordance with § 704(a). *New York,* 505 U.S. at 173–74, 112 S.Ct. 2408; *Hodel,* 452 U.S. at 288, 101 S.Ct. 2352. In other words, § 704(a) does not become unconstitutional "simply because Congress chose to allow the states a regulatory role" in a preemptible field. *Hodel,* 452 U.S. at 290, 101 S.Ct. 2352.

As a result, I conclude that § 704(a) does not violate the Tenth Amendment, and, because the Board has not demonstrated otherwise, its constitutionality must be upheld. *See Marshall v. Rose,* 616 F.2d 102, 104 (4th Cir.1980) ("The constitutionality of a statute promulgated under the authority of the Commerce Clause is presumed....").

### III.

On the other hand, Judge Niemeyer would hold today that the choice § 704(a) presents to states—regulate according to federal standards or not at all—unconstitutionally "commandeers" state legislative processes, and thus violates the Tenth Amendment. *E.g., ante* at 703. This conclusion would require us to force the facts of this case into the scope of inapposite Supreme Court precedent and adopt a position that the Court has expressly rejected.

### A.

Judge Niemeyer concludes that the choice § 704(a) presents states is "[s]imilar to the option offered to states" by the LRWPAA's "take title" provision, which the Supreme Court rejected in *New York*. *Ante* at 703. Specifically, his separate opinion views the policy decision to abandon zoning regulation of telecommunication towers as "not a viable option," *ante* at 703; as a result, he concludes that § 704(a) is "no less coercive than" the take title provision. *Ante* at 703. But regardless of whether § 704(a) is "similar" to the take title provision, the dissimilarities between these laws are dispositive in this case.

Put simply, the take title provision—in contrast to § 704(a)—was not a *conditional* exercise of any Congressional power. Justice O'Connor, writing for the majority in *New York*, acknowledged and emphasized this fact: "Unlike the first two sets of incentives, the take title incentive does not represent the conditional exercise of any congressional power enumerated in the Constitution." *New York*, 505 U.S. at 176, 112 S.Ct. 2408. Instead, the Court reasoned, the provision unconstitutionally

presented states with a "choice" between regulating in accordance with one mandatory federal instruction or regulating according to another: "Either way, the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program...." *Id.* (citations and internal quotation marks omitted).

Because the take title provision was not a conditional exercise of valid Congressional authority, the Court struck it down, ultimately issuing its oftcited holding: "The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 188, 112 S.Ct. 2408.

Although Judge Niemeyer correctly identifies this holding of *New York*, I am not persuaded it applies here. Unlike the take title provision—which gave states no legal option but to take affirmative, federally mandated actions—§ 704(a) provides states an alternative to reviewing permit applications in accordance with federal standards: A state unwilling to process applications as § 704(a) directs may abandon the field.[5] The Supreme Court has repeatedly blessed statutory schemes that require states to abandon a preemptible regulatory field if they do not wish to regulate in accordance with federal instructions. *FERC*, 456 U.S. at 764–65, 102 S.Ct. 2126; *Hodel*, 452 U.S. at 288, 101 S.Ct. 2352. This is the essence of conditional preemption, a regulatory technique that *New York* reaffirms. *New York*, 505 U.S. at 173–74, 112 S.Ct. 2408.

Nevertheless, Judge Niemeyer insists that § 704(a) is not actually an example of conditional preemption because, in his view, the Act does not afford states a

---

**5.** Contrary to Judge Niemeyer's suggestion, § 704(a) does not conditionally preempt *all* local zoning decisions regarding all types of facilities. *See ante* at 702 ("Nottoway County observes that its only choice would be to *abandon the business of land-use regulation* ....") (emphasis added); *ante* at 703 ("The 'choice' suggested—that Nottoway County comply with § 704(a) ... or *end its role as a*

*land-use regulator* ....") (emphasis added); *ante* at 703 ("To suggest that a local governmental body *withdraw from land-use regulation* ....") (emphasis added). States must simply follow § 704(a)'s procedures or not regulate the siting of telecommunications towers that are covered by the Act. They may, of course, continue to exercise zoning authority over all other types of structures.

"meaningful" choice: "Indeed it is not a choice at all. The [Act] does not suggest it, and it cannot be implied except in an ontological sense...." *Ante* at 703. But if § 704(a) provides states no implied choice, then the Supreme Court was wrong to find such a choice implicit in PURPA, the statute at issue in *FERC.* PURPA flatly mandated that each state take certain federally prescribed actions, *i.e.,* hold public hearings to consider adopting federal regulatory standards and, if it rejected the standards, publish a written statement of its reasons. *See FERC,* 456 U.S. at 764–71, 102 S.Ct. 2126. Nevertheless, the Supreme Court read PURPA as containing an implicit choice identical to the one implied by § 704(a): "[I]f a State has no utilities commission, *or simply stops regulating in the field,* it need not even entertain the federal proposals." *Id.* at 764, 102 S.Ct. 2126 (emphasis added); *see also id.* at 766, 102 S.Ct. 2126 ("We recognize, of course, that the choice put to the States— *that of either abandoning regulation of the field altogether* or considering the federal standards—may be a difficult one.") (emphasis added).

Regardless of whether the choice implicit in § 704(a) is "meaningful" or "viable," *ante* at 699–700, 703, that choice undeniably exists, as it did in *FERC.* Judge Niemeyer's analysis confirms the substance of this choice. *See, e.g., ante* at 705 ("[I]n the [Act], Congress mandated *either* application of federal standards *or* the abdication of all zoning authority over communications facilities.") (emphasis added). Consequently, his opinion fails in its attempt to cast § 704(a) as the type of *unconditional* federal command that *New York* forbids.

B.

Despite these dispositive differences between the statutes, Judge Niemeyer insists that § 704(a) is "no less coercive than" the take title provisions of the LRWPAA, and is therefore unconstitutional. *Ante* at 703. In reaching this conclusion, he contends that the option § 704(a) has given states— to refrain from regulating the siting of wireless towers altogether—is somehow an impermissible use of the commerce power. As best I can determine, his separate opinion would hold that Congress cannot prohibit state zoning decisions in this field because zoning involves a state's exercise of its "core powers of regulating land use" through "its traditional legislative process" *ante* at 705. Because these matters are among the "most vital aspects" of the "core function of local government," *ante* at 703, he apparently concludes that states may not be required to relinquish those functions.

Notably, *Hodel* confirms that Congress may forbid states from regulating certain major aspects of land use—there, surface mining—unless they promulgate regulations consistent with federal standards. 452 U.S. at 288, 101 S.Ct. 2352. Judge Niemeyer simply ignores *Hodel* altogether and cites no Supreme Court—or any other—precedent for the proposition that, when exercising its powers under the Commerce Clause, Congress may not displace states' power to carry out their "traditional" or "core" government functions.

However, the Supreme Court did announce a rule nearly identical to this position in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In *National League of Cities,* the Court concluded that certain amendments to the Fair Labor Standards Act (FLSA) violated the Tenth Amendment to the extent that they subjected state employers to federal minimum wage and maximum hours restrictions. The Court held that the structure of our federal system of government prevented Congress from overriding state authority in this traditionally state-controlled field:

> We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of *traditional government functions,* they are not within the authority granted Congress by Art. I, § 8, cl. 3.

*Id.* at 852, 96 S.Ct. 2465 (emphasis added).

However, this rule of *National League of Cities* has been expressly overruled by

the Supreme Court. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 557, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In overruling *National League of Cities*, the Court disavowed the precise rule Judge Niemeyer would revive today:

> We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is "integral" or "traditional."

*Garcia*, 469 U.S. at 546–47, 105 S.Ct. 1005. Nevertheless, Judge Niemeyer invokes—in various formulations—the "traditional function" standard that *Garcia* rejected: "Because application of ... § 704(a) ... would require us to overrule the will of Nottoway County *exercised through its traditional legislative process*, we must address the provision's constitutionality...." *Ante* at 710 (emphasis added); *see also ante* at 697 (describing § 704(a) as an "uninvited intrusion into *traditional state and local zoning authority* ...") (emphasis added); *ante* at 704 (§ 704(a) "effectively *requires* state and local governments who choose to exercise their *core powers of regulating land use* to apply a federally mandated standard and process") (second emphasis added); *ante* at 703 (§ 704(a) gives local governmental body the choice to "end its existence in *one of its most vital aspects.*") (emphasis added).

Importantly, the Supreme Court has not expressly overruled *Garcia*.[6] Given the unambiguous manner in which the Court rejected the *National League of Cities* rule, it would be unwise to infer that it has implicitly resurrected that rule. *Garcia*, 469 U.S. at 557, 105 S.Ct. 1005 ("*National League of Cities v. Usery* is overruled.") (citations omitted). And a recent en banc decision of this court reminds us to be wary of inferring that the Supreme Court has silently discarded its precedent. *See Brzonkala v. Virginia Polytechnic Inst.*, 169 F.3d 820, 880 (4th Cir.1999) (en banc) (announcement that Supreme Court precedent has been overruled "must come from that Court itself"). Without a more affirmative pronouncement from the Court, "[W]e are without authority to deviate from binding Supreme Court precedent." *Id.* at 889; *see also id.* at 926 n. 10 (Motz, J., dissenting) ("*Garcia* ... remains the law of the land....."). As a result, I cannot endorse the apparent attempt to resurrect the traditional function rule, which the Supreme Court expressly rejected fourteen years ago.

It is telling that the application of the traditional function standard to this case evinces some of the same flaws the *Garcia* court warned against. In that case, the Court rejected the traditional function standard partly because it allowed the contours of the Tenth Amendment to vary with the local policy preferences of federal judges:

> Any rule of state immunity that looks to the "traditional," "integral," or "necessary" nature of governmental functions inevitably invites an unelected federal judiciary to make decisions about which state policies it favors and which ones it dislikes.

*Garcia*, 469 U.S. at 546, 105 S.Ct. 1005.

Having ignored *Garcia*'s warning, it is not surprising that Judge Niemeyer seeks to buttress his constitutional analysis by emphasizing the importance of local zoning policy and the dangers inherent in preemption of local zoning authority. He reasons that the Board cannot be forced to refrain from regulating the siting of towers because "land-use decisions are a *core function* of local government. Few other

---

6. At the time *Garcia* was decided, it was predicted that *Garcia* would be overruled. *See Garcia*, 469 U.S. at 580, 105 S.Ct. 1005 (Rehnquist, J., dissenting) (predicting that the *National League of Cities* rule will "in time again command the support of a majority of this Court."). However, given that the Chief Justice himself has predicted that *Garcia* would be overruled, 469 U.S. at 580, 105 S.Ct. 1005, it seems especially unlikely that the Court would take that step without acknowledging that it was fulfilling the Chief Justice's prediction.

municipal functions have such an important and direct impact on the daily lives of those who live or work in a community." *Ante* at 703 (quoting *Gardner v. City of Baltimore,* 969 F.2d 63, 67 (4th Cir.1992)). Judge Niemeyer then trots out a "parade of horribles" to describe the adverse effects that, he believes, would flow from the lack of local zoning control over telecommunications towers. For example, he warns against falling property values and "the possibility that aesthetic quality of every area in the jurisdiction would be destroyed." *Ante* at 703. Finally, Judge Niemeyer rejects the idea of withdrawing local zoning authority in this field because, as a policy matter, it is not a "viable option for state and local governments." *Ante* at 703.

Presumably, then, Judge Niemeyer's conclusion would be different if § 704(a) gave local governments the option of relinquishing a function that he deemed less important. However, the boundaries of the Tenth Amendment and the Commerce Clause cannot shift based on which courses of action federal judges think are important or "viable" as a matter of local governmental policy, or which functions judges view as the "most vital aspects" of local government. This is exactly the result the Supreme Court warned against in *Garcia,* and one of its primary reasons for rejecting the traditional function standard. *See* 469 U.S. at 546, 105 S.Ct. 1005.

### C.

The final precedent with which Judge Niemeyer unsuccessfully wrestles is *FERC.* He attempts to distinguish *FERC* on its facts, point-ing out that the provision of the Public Utility Regulatory Policies Act of 1978 (PURPA) challenged in *FERC* required states only to *consider* federally prescribed regulations—rather than requiring them to *enact* such regulations—as a precondition to continued state regulation of public utilities. *Ante* at 704–05. While this distinction does exist, it makes no difference here.

The Court in *FERC* cited *Hodel* approvingly, and it characterized the law at issue in *Hodel* as follows: "There, the Federal Government could have preempted all surface mining regulations; instead, it allowed the States to enter the field if they *promulgated regulations consistent with federal standards.* In the Court's view, this raised no Tenth Amendment problem...." *FERC,* 456 U.S. at 764, 102 S.Ct. 2126 (emphasis added). Because it approved of *Hodel,* the Court in *FERC* obviously did not view a conditional command that states *promulgate* federally prescribed regulations as any less constitutional than the conditional command to *consider promulgating* such regulations at issue in *FERC.*

At bottom, the laws reviewed in *FERC* and *Hodel*—like § 704(a)—required states to take *affirmative,* federally prescribed actions as the price of continued state regulation in a preemptible field. *E.g., id.* at 765, 102 S.Ct. 2126 ("While the condition here is affirmative in nature ... nothing in this Court's cases suggests that the nature of the condition makes it a constitutionally improper one."). Under Judge Niemeyer's own analysis, the *extent* of the state action conditionally required cannot be relevant, because "the command that the Federal Government may not compel the States to enact or administer a federal regulatory program is categorical." *Ante* at 700 (internal quotation marks omitted). Thus Judge Niemeyer, under his own logic, cannot distinguish *FERC* by asserting that the law at issue there sought to induce *less* state action than does § 704(a).

As a factual matter, though, it is not even clear that the state action mandated by PURPA, and upheld in *FERC,* was less extensive than that required by § 704(a). In addition to requiring state governments to consider adopting federal standards, PURPA mandated the procedures that states were to follow when they did consider those standards. For example, PURPA required the states to examine each standard in a public hearing after notice. *FERC,* 456 U.S. at 748, 102 S.Ct. 2126. Additionally, if states rejected the federal standards, they were required to provide a

written statement of their reasons to the public. *Id.* The Supreme Court expressly held that these procedural standards did not violate the Tenth Amendment:

> If Congress can require a state administrative body to consider proposed regulations as a condition to its continued involvement in a pre-emptible field—and we hold today that it can—there is nothing unconstitutional about Congress' requiring certain procedural minima as that body goes about undertaking its tasks.

*Id.* at 771, 102 S.Ct. 2126. Consequently, PURPA went a good deal further in prescribing the details of state action than does § 704(a).

Finally, Judge Niemeyer quotes the *FERC* Court's statement that it "never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations." *Ante* at 704 (quoting *FERC,* 456 U.S. at 761–62, 102 S.Ct. 2126). Nevertheless the Court in *FERC* reaffirmed *Hodel,* which the Court itself characterized as involving a conditional command to "promulgate[ ] regulations consistent with federal standards." *FERC,* 456 U.S. at 764, 102 S.Ct. 2126. Apparently, the Court did not equate such a *conditional* command—which gave states the option of abandoning the field—with an *unconditional* command, like those it would later strike down in *New York* and *Printz.* Indeed, the language of *New York* itself confirms that Congress may condition the exercise of its preemption power on states actually "regulating ... according to federal standards." *New York,* 505 U.S. at 173–74, 112 S.Ct. 2408.

Consequently, the argument that *FERC* sanctions only conditional commands that states *consider* adopting federal standards is inconsistent with the text of *FERC* and the plain language of *New York.*

### IV.

Because § 704(a) is a valid exercise of Congress's power under the Commerce Clause, the Board's constitutional challenge should be rejected by this court.

And because the district court was right to find the Board's decision unsupported by substantial evidence, I would affirm the district court's judgment, with a modification of its remedy. Therefore, I must respectfully dissent.